*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

HUNTINGTON NATIONAL BANK,

        Plaintiff,

and

TARRANT ASSURANCE FUNDING LIMITED
PARTNERSHIP,

        Plaintiff-Appellee,

v

BRENDA S. STEUER, individually and as Trustee
of the BRENDA S. STEUER REVOCABLE
TRUST, and STEUER & ASSOCIATES, INC.,

        Appellants/Cross-Appellees,

and

MARK A. CANVASSER, as Trustee of the MARK
A. CANVASSER REVOCABLE TRUST, DAVID
L. STEUER, individually and as Trustee of the
DAVID L. STEUER REVOCABLE TRUST, and
MILLER PARK TOWNHOME CONDOMINIUMS,
LLC,

        Defendants,

and

EDEN GLEN CONDOMINIUM ASSOCIATION,
CANVASSER DEVELOPMENT, INC., SCOTT
EISENBERG, and INGHAM COUNTY
TREASURER,

UNPUBLISHED
July 16, 2020

No. 346998
Ingham Circuit Court
LC No. 07-000790-CK

-1-

Intervenors,

and

STUART R. SHAFER, Receiver,

Intervenor-Appellee/Cross-Appellant.

Before: FORT HOOD, P.J., and JANSEN and TUKEL, JJ.

PER CURIAM.

Appellants/cross-appellees, Steuer & Associates (SAA) and Brenda S. Steuer (Brenda), individually and as the trustee of the Brenda S. Steuer Revocable Trust (BSST)[1], appeal as of right the trial court's opinion and order entered after a postjudgment bench trial covering the powers of appellee/cross-appellant Stuart R. Shafer,[2] who was appointed as a receiver during the proceedings below, to assist in collecting a judgment entered against Brenda's husband, David L. Steuer (David), and in favor of Tarrant Assurance Funding Limited Partnership (Tarrant). The court found that certain assets that had been transferred to Brenda and the BSST by David, either in his own name or in the name of SAA, the couple's company, were attachable by Shafer to be used to satisfy the judgment against David because the transfers had been made fraudulently for the purpose of avoiding satisfaction of the judgment. We affirm in part, reverse in part, and remand for clarification of the trial court's order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

David and his former business partner, Mark Canvasser, operated a home-construction business in Detroit. At one point, David and Canvasser borrowed approximately $4,000,000 from Huntington National Bank (Huntington) for purposes of a condominium project. When the real estate market began to "crash," David and Canvasser defaulted on the loan, and in June 2007, Huntington sued them. In February 2009, a judgment of approximately $4,000,000 was entered against David and Canvasser, jointly and severally. Later that year, Huntington assigned its interest in the judgment to Tarrant.[3] The judgment became final in December 2011.[4] At the

---

[1] Brenda and SAA are referred to in this opinion either individually or, collectively, as "appellants" or "cross-appellees."

[2] This party is referred to in this opinion as "Shafer," "the receiver," "appellee," or "cross-appellant." Tarrant Assurance Funding Limited Partnership is also an appellee in the main appeal, but for ease of reference this opinion uses the singular term "appellee." The company has merely adopted Shafer's appellee brief, without modification.

[3] Evidence was presented that Tarrant obtained the judgment for an amount much less than $4,000,000.

[4] We refer to the judgment against David as "the Tarrant judgment" in this opinion.

request of Tarrant, the court appointed Shafer as a postjudgment receiver of David's assets, to aid in the satisfaction of this judgment. It is solely the postjudgment proceedings that are at issue in the present appeal. The postjudgment proceedings eventually progressed to a bench trial, after which the trial court concluded that David had fraudulently transferred several assets to Brenda and the BSST in order to avoid satisfaction of the judgment. The court deemed these assets attachable by Shafer. The court also concluded that several assets had not been transferred fraudulently and were not subject to attachment. This appeal followed.

## II. APPELLANTS' CLAIMS ON APPEAL

## A. AUTHORITY OF THE RECEIVER TO CHALLENGE THE ASSET TRANSFERS

Appellants first argue that Shafer had no authority to challenge the transfers made to Brenda or the BSST. We disagree.

This issue involves a question of law, and this Court reviews issues of law de novo. *Hill v L F Transp, Inc*, 277 Mich App 500, 507; 746 NW2d 118 (2008). Moreover, the issue was addressed by way of a motion for summary disposition brought before the bench trial. This Court also reviews summary disposition decisions de novo. *Dell v Citizens Ins Co of America*, 312 Mich App 734, 739; 880 NW2d 280 (2015).

Appellants argue that a receiver stands in the shoes of a debtor and a debtor has no standing to recover a fraudulent transfer because the transfer is *valid* in the eyes of the debtor. They argue that Shafer, as David's proxy, had no standing to pursue any claims against Brenda or her associated entities. This assertion is belied by applicable Michigan authorities.

As authority for bringing his fraudulent transfer claims, Shafer cited the Revised Judicature Act of 1961 (RJA), MCL 600.101 *et seq.*, and also cited the Michigan uniform fraudulent transfer act (MUFTA), MCL 566.31 *et seq*. MCL 600.6104, a provision of the RJA, states:

> After judgment for money has been rendered in an action in any court of this state, the judge may, on motion in that action or in a subsequent proceeding:
>
> * * *
>
> (4) *Appoint a receiver of any property the judgment debtor has or may thereafter acquire*; and
>
> (5) *Make any order as within his discretion seems appropriate in regard to carrying out the full intent and purpose of these provisions to subject any nonexempt assets of any judgment debtor to the satisfaction of any judgment against the judgment debtor*. . . . [Emphasis added.]

MCL 600.6128, another provision of the RJA, states:

> (1) Where it appears to the court that:

(a) *The judgment debtor may have an interest in or title to any real property, and such interest or title is disclaimed by the judgment debtor or disputed by another person*;

(b) The judgment debtor may own or have a right of possession to any personal property, and such ownership or right of possession is substantially disputed by another person; or

(c) A third party is indebted to the judgment debtor, and the obligation of the third party to pay the judgment debtor is disputed*; the court may, if the person or persons claiming adversely is a party to the proceeding, adjudicate the respective interests of the parties in such* debt or *real* or personal *property*, and may determine such property to be wholly or in part the property of the judgment debtor, or that the debt is owed the judgment debtor.

(2) *If the person claiming adversely to the judgment debtor is not a party to the proceeding, the court shall by show cause order or otherwise cause such person to be brought in and made a party thereto*, and shall set such proceeding for early hearing. [Emphasis added.]

MCL 600.6131(3), yet another provision of the RJA, states:

Where it appears that the judgment debtor at a time within 1 year prior to the date of the commencement of the action in which the judgment is entered has had title to or has paid the purchase price of any real or personal property to which at the time of the examination his wife, or a relative or a person on confidential terms with the judgment debtor may claim title or right of possession, the burden of proof shall be upon the judgment debtor, or person claiming title or right of possession, to establish that the transfer or gift from him was not made for the purpose of delaying, hindering, and defrauding creditors.

MCL 600.2926, a fourth provision of the RJA, states, in part:

Circuit court judges in the exercise of their equitable powers, may appoint receivers in all cases pending where appointment is allowed by law. This authority may be exercised in vacation, in chambers, and during sessions of the court. *In all cases in which a receiver is appointed the court* shall provide for bond and *shall define the receiver's power and duties where they are not otherwise spelled out by law*. Subject to limitations in the law or imposed by the court, the receiver shall be charged with all of the estate, real and personal debts of the debtor as trustee for the benefit of the debtor, creditors and others interested. [Emphasis added.]

In light of the foregoing, we conclude that the RJA authorizes the appointment of a receiver and refers to a trial court's broad discretion in achieving the satisfaction of judgments. It addresses the issue of fraudulent transfers of real property—and the present case encompasses such a transfer. Significantly, it also allows the court to define a receiver's powers and duties, and, as

noted, the court in the present case specifically ruled that Shafer could pursue claims against Brenda, SAA, and the BSST.

Moreover, in *Prescott v Pfeiffer*, 57 Mich 21, 23; 23 NW 477 (1885), our Supreme Court concluded that a receiver could sue to attach fraudulent transfers, in law or equity, as the case might require. Further, in *Pontiac Trust Co v Newell*, 266 Mich 490, 499-500; 254 NW 178 (1934), the Court stated, "[w]hen persons other than the receiver have property in their hands which should be in the hands of the receiver, or when any person diverts or attempts to divert from the receiver property which belongs to the receiver, such receiver may take all appropriate steps in law or equity to reduce such property to possession and protect it from being diverted from its lawful custodian." Finally, in *Woodliff v Frechette*, 254 Mich 328, 330-331; 236 NW 799 (1931), the Court cited with approval the proposition that a receiver is normally limited to suing only on behalf of the debtor, *except* in those instances when he or she is suing on behalf of a creditor to avoid fraudulent transfers by the debtor. The *Woodliff* Court also noted that a receiver "derives his authority as such receiver from the statutes and rules of court, the order appointing him, and specific orders which may from time to time be made by the court of his appointment." *Id*. at 329. The receiver's actions in this case conformed with the court's orders. As stated in *Hofmeister v Randall*, 124 Mich App 443, 445; 335 NW2d 65 (1983), receivership is generally a matter of equity to allow the court to obtain justice for the parties before it, and a receiver is essentially an arm of the court used to preserve the litigating parties' property.

Under applicable statutes and caselaw, Shafer had the authority to pursue the claims against Brenda, the BSST, and SAA. Tarrant is the entity who requested Shafer's appointment, a lawyer for Tarrant was present at trial, and Tarrant has joined in appellee's brief on appeal. This belies appellants' assertion that Tarrant could obtain an inconsistent judgment in a separate proceeding; it would clearly be bound by res judicata.[5]

Appellants argue that this case is governed *solely* by the MUFTA and that the MUFTA does not allow a receiver to pursue claims on behalf of a creditor. But a review of the RJA provisions cited above contradicts this assertion.[6] The MUFTA, at any rate, states that a "creditor" can obtain an attachment of a transferred asset, MCL 566.37(1)(b), but it also states that a creditor can obtain,

---

[5] Also, as noted by appellee on appeal, at the time of Shafer's appointment, MCR 2.622 stated that "[i]f a person brought before the court by [a] judgment creditor . . . claims an interest in . . . property . . . adverse to the judgment debtor, and a receiver has been appointed, the interest may be recovered only in an action by the receiver." Brenda and her associated entities *were* claiming an interest adverse to David. And the receiver, *appointed at the request of Tarrant*, had been empowered by the court to add the third parties to the proceedings.

[6] MCL 600.6143 states that chapter 61 of the RJA "is in addition to and does not affect enforcement of judgments or proceedings supplementary thereto, by any other methods now or hereafter provided by law." In other words, the RJA provides *additional* avenues for obtaining enforcement of judgments, aside from any that may derive from the MUFTA.

[s]ubject to applicable principles of equity and in accordance with applicable court rules and statutes, 1 or more of the following:

(*i*) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property.

(*ii*) Appointment of a receiver to take charge of the asset transferred or of other property of the transferee.

(*iii*) *Any other relief the court determines appropriate.* [MCL 566.37(1)(c) (emphasis added).]

The court here deemed it appropriate that a receiver be appointed, at the request of the creditor, and that the receiver pursue fraudulent transfer claims against appellants. Thereafter, a lawyer for Tarrant appeared throughout trial. Appellants admitted below that Tarrant *asked* the receiver to bring the supplemental complaint. The court granted Tarrant "other relief" under MCL 566.37(1)(c)(*iii*) by allowing the receiver to pursue the fraudulent transfer claims in accordance with Michigan caselaw. In light of all the applicable statutes and caselaw, appellants' argument that the MUFTA somehow barred the receiver's action in the present case is unpersuasive.

## B. TRANSFER OF STOCK PROCEEDS

Appellants next argue that the trial court erred by finding that proceeds from the sale of stock in a company called "Sun Healthcare" had been fraudulently transferred into the BSST and those proceeds therefore were subject to attachment by the receiver. We agree.

The parties agree that this issue is one of law because it involves the legal characterization of the proceeds. A trial court's conclusions of law following a bench trial are reviewed de novo. *Chelsea Investment Group LLC v Chelsea*, 288 Mich App 239, 250; 792 NW2d 781 (2010).

The parties also agree that property held by the entirety is not subject to a fraudulent transfer action in the present case. The MUFTA specifically excludes from the definition of attachable "asset" an "interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only 1 tenant." MCL 566.31(b)(*iii*). However, the trial court determined that even if the stock had been held by the entirety, this entireties status was dissolved when the stock was converted into cash, and therefore subsequent transfer of the cash into the BSST was fraudulent. We cannot agree.

MCL 557.151 states:

All bonds, certificates of stock, mortgages, promissory notes, debentures, or other evidences of indebtedness hereafter made payable to persons who are husband and wife, or made payable to them as endorsees or assignees, or otherwise, shall be held by such husband and wife in joint tenancy unless otherwise therein expressly provided, in the same manner and subject to the same restrictions, consequences and conditions as are incident to the ownership of real estate held

-6-

jointly by husband and wife under the laws of this state, with full right of ownership by survivorship in case of the death of either.

This Court has concluded that checks payable jointly to a married couple are "evidence of indebtedness made payable to persons who [are] husband and wife" under MCL 557.151. *Theisen v Theisen*, 27 Mich App 356, 358; 183 NW2d 373 (1970). In *DeYoung v Mesler*, 373 Mich 499, 504; 130 NW 38 (1964), our Supreme Court concluded that MCL 557.151 operates to create a tenancy by the entirety when a debenture is conveyed jointly to a husband and wife, unless "an intent to do otherwise is affirmatively expressed." *Id*. at 501-502, 504. The Court discussed real estate law and noted, "[i]n Michigan, the common-law rule that a conveyance to husband and wife creates a tenancy by the entirety has persisted except in respect to conveyances explicitly indicating that some other kind of tenancy is intended." *Id*. at 504 (citations and quotation marks omitted). The Court stated, "Such being the case as to conveyances of realty under our settled law, we are constrained to hold that the language of the statute is indicative of a legislative intent to create in the evidences of indebtedness specified in the statute an estate by the entireties." *Id*.

In this case, the stock sale occurred on December 4, 2012, and tax documents identify David and Brenda as recipients of the monies. The document refers to "proceeds from broker and barter exchange transactions." It specifically lists Sun Healthcare as the "payer" and David and Brenda as the recipients as tenants by the entirety.[7] While the appellate record does not contain a jointly payable *check* as in *Theisen*, 27 Mich App at 358, it does contain clear and uncontroverted evidence[8] of a broker exchange resulting in proceeds being transferred from the "payer" to the husband and wife recipients, jointly. The uncontroverted evidence shows that when Sun Healthcare initiated a forced redemption,[9] there was "indebtedness" "payable" to Brenda and David as tenants by the entirety. In essence, we conclude that the whole of the Sun Healthcare transaction was analogous to the check as discussed in *Theisen*. The stock was held by David and Brenda as tenants by the entirety, with proceeds payable to them as husband and wife, and subject to a forced redemption. We conclude that under the authority of MCL 557.151, *Theisen*, and *DeYoung*, David and Brenda held the stock and its resultant proceeds by the entirety. Accordingly, the trial court erred by finding that it was fraudulent for David and Brenda to move the stock proceeds money into a BSST account because the proceeds were not reachable by Tarrant in the first instance.

## C. TRANSFER OF HOUSE ON OTTER LAKE

Third, appellants argue that the trial court erred by finding that the value of a house on Otter Lake (the Otter house) was subject to attachment by the receiver because the house was not mentioned in the receiver's complaint, and because the limitations period had passed with regard to any Otter house claim. This issue was not raised in a timely fashion below and we thus review

---

[7] The earlier stock-acquisition documents also list David and Brenda as tenants by the entirety.

[8] Appellee, on appeal, cites to nothing contradicting the stock documents referred to by appellants.

[9] Appellee does not dispute that the stock was sold because of a forced redemption.

it under the plain-error doctrine of *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). *Kern v Blethen-Coluni*, 240 Mich App 333, 336; 612 NW2d 838 (2000).

As an initial matter, appellee does not contest the assertion that the applicable statute of limitations would, if applied, bar attachment by the receiver of the value of the Otter house. David transferred the house to Brenda in 2007, and the receiver filed his supplemental complaint in March 2014. The limitations period is six years. MCL 566.39(a); MCL 600.5813. Appellee argues, however, that appellants waived application of the statute of limitations because they (1) failed to raise it, aside from making a general, blanket statute of limitations reference in their answer to the complaint; and (2) participated in litigating the issue of the transfer of the Otter house. Appellee also argues that appellants, by participating in litigating the issue, acquiesced to the trial court's resolution of the issue despite the fact that the Otter house was not specifically mentioned in the complaint.

In filing his initial motion for supplemental proceedings, the receiver stated that David "enjoys a boat and a cottage on Otter Lake in Brenda Steuer's name." In addition, even though the Otter house was not specifically mentioned in the complaint, it was discussed extensively at trial. David testified that he transferred the deed to the Otter house to Brenda approximately four months after the 2007 commencement of the present lawsuit. David claimed that he could not remember if he received payment for the transfer of the Otter house, but later stated that he did not receive anything in exchange aside from the "proverbial dollar." David testified that the Otter house was owned for the benefit of his and Brenda's children and that no "trickery" was involved in connection with its ownership. David also claimed that at the time he transferred the Otter house to Brenda, it had had no net equity.

In *Leavenworth v Mich Nat Bank*, 59 Mich App 309, 314; 229 NW2d 429 (1975), this Court concluded that an issue had been tried by implied consent of the parties. This Court stated that in that case, the defense never objected to the introduction of evidence regarding the issue. *Id*. at 314. Further, this Court noted, "[n]or did defendant either claim any prejudice from a trial on the issue or request a continuance." *Id*. The same can be said about the Otter house issue in the present case. Appellee specifically requested in its posttrial pleadings that the value of the Otter house be deemed attachable. Appellants, in responding to this posttrial brief, raised no objection to this request. As stated in MCR 2.118(C)(1), "When issues not raised by the pleadings are tried by express or implied consent of the parties, they are treated as if they had been raised by the pleadings." Under the circumstances, no plain-error is apparent with regard to the fact that the trial court issued a ruling regarding the Otter house even though it was not specifically mentioned in the complaint.

In *Attorney Gen ex rel Dep't of Environmental Quality v Bulk Petroleum Corp*, 276 Mich App 654, 665; 741 NW2d 857 (2007), this Court concluded that "a statute of limitations defense is an affirmative defense that may be waived." "Such a waiver may be shown by a course of acts and conduct, and in some cases will be implied therefrom." *Id*. (quotation marks and citations omitted). This Court stated:

> Even if defendants had properly asserted a statute of limitations defense in their responsive pleading, they failed to reiterate such a defense in response to plaintiff's motion for summary disposition. In the motion for summary disposition,

plaintiff asserted that no genuine issue of material fact existed with regard to defendants' liability for the alleged statutory violations. In responding to the motion, defendants made no reference to any statute of limitations as an affirmative defense to plaintiff's claims.

\* \* \*

[B]y failing to raise a statute of limitations defense in response to plaintiff's motion for summary disposition and at the first hearing regarding penalties, defendants waived the defense. [*Id*. at 665-666.]

Similarly, appellee in the present case argued forcefully for attachment of the value of the Otter house, yet appellants did not raise the limitations period as a defense. In light of binding precedent, appellee's appellate argument provides no basis for reversal.

### D. ALLEGED LOANS TO SAA BY BRENDA

Finally, appellants argue that the trial court erred by concluding that certain monies transferred to Brenda by SAA were not legitimate transfers of loan repayments. We disagree.

The issue of the alleged loans involves a factual finding subject to clear-error review. *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003). "A finding is clearly erroneous where, after reviewing the entire record, this Court is left with a definite and firm conviction that a mistake has been made." *Id*.

Although David, Brenda, and appellants' expert witness, Brenda Orlando, testified that Brenda had made various loans to SAA and that certain payments made to her or the BSST were repayments on these loans, the trial court's finding that no such loans had been made was not clearly erroneous. First, the court specifically concluded that Orlando's testimony on this point was not credible. As stated in *Ambs v Kalamazoo Co Rd Comm'n*, 255 Mich App 637, 652; 622 NW2d 424 (2003), an appellate court is to give deference to the trial court's "superior ability" to judge the credibility of witnesses at trial.

Additionally, ample evidence supported the court's conclusion that no such loans existed. David admitted that no loan agreement had been put in writing. Later, David appeared to admit that much of the "loaned" money came from joint accounts. He also said that no interest rate or repayment due date had been established. Moreover, there was no written documentation about security for the "loans." David claimed that Brenda's security was expected returns from SAA, but he testified that SAA had a net value at trial of $10,000. Brenda admitted that there were no specific terms for the alleged loans but that she was hopeful that she would be repaid. She also admitted that a lot of the money she put into SAA was used to pay for David's personal liabilities, and that she used joint accounts at times to make her "loans." Appellants' own expert admitted that the joint funds belonged as much to David as to Brenda. Appellee's expert witness, Richard Henderson, testified that there was no evidence of any loans by Brenda or interest charged. He

admitted that some checks had "loan" written on them and that tax returns referred to loans, but he said that the "loans" were shareholder loans from David.[10]

A review of the evidence as a whole does not leave one with a definite and firm conviction that the trial court was mistaken when rejecting the argument that certain monies transferred to Brenda or the BSST from SAA were legitimate loan repayments. *Alan Custom Homes*, 256 Mich App at 512.

### III. APPELLEE'S CROSS-APPEAL

### A. TRANSFER OF INCOME-TAX REFUNDS

On cross-appeal, Shafer argues that the trial court erred by concluding that income-tax refunds from amended joint returns filed by David and Brenda to take advantage of loss-carryback rules constituted entireties property not subject to fraudulent transfer claims in this case. We disagree. This issue involves a question of law, and, as noted, this Court reviews issues of law de novo. *Hill*, 277 Mich App at 507.

As indicated earlier, MCL 557.151 states:

> All bonds, certificates of stock, mortgages, promissory notes, debentures, or other evidences of indebtedness hereafter made payable to persons who are husband and wife, or made payable to them as endorsees or assignees, or otherwise, shall be held by such husband and wife in joint tenancy unless otherwise therein expressly provided, in the same manner and subject to the same restrictions, consequences and conditions as are incident to the ownership of real estate held jointly by husband and wife under the laws of this state, with full right of ownership by survivorship in case of the death of either.

Checks payable jointly to a married couple are "evidence of indebtedness made payable to persons who [are] husband and wife." *Theisen*, 27 Mich App at 358. And again, the Supreme Court has construed MCL 557.151 to mean that a conveyance to a husband and wife creates a tenancy by the entirety in the absence of explicit language to the contrary. *DeYoung*, 373 Mich at 504. The checks that are acknowledged to have been addressed to David and Brenda—i.e., the check for $117,057, the check for $121,513.16, and the check for $66,607—fit within this statutory law and caselaw—i.e., they were held by the entireties.[11]

---

[10] Orlando appeared to admit that certain "loans" had originally been "booked" as loans from David and were later reclassified as loans from Brenda. She also admitted that "loaned" money came from joint accounts.

[11] Despite the parties' urging, we decline to rely on a nonbinding federal case cited by the parties, or other nonbinding cases cited by cross-appellant.

Shafer argues that even if the jointly addressed checks are viewed as entireties property, entireties property cannot be created, after a judgment, to keep creditors from assets. He contends that this prohibited action has happened here. Presumably, this argument encompasses not only the jointly addressed checks but also certain checks belonging solely to Brenda that were associated with joint returns.[12] But the Michigan cases cited by Shafer are distinguishable.

Shafer relies on *Newlove v Callaghan*, 86 Mich 297; 48 NW 1096 (1891) aff'd 86 Mich 301 (1891), *McCaslin v Schouten*, 294 Mich 180; 292 NW 696 (1940), and *Dunn v Minnema*, 323 Mich 687; 36 NW2d 182 (1949). In *Newlove*, 86 Mich at 300-301, the defendant purchased entireties real estate with monies that should have been subject to collection by creditors, and the Court found this to be fraudulent. In *McCaslin*, 294 Mich at 185, the Court stated that "payment on [a] mortgage debt was tantamount to an investment of [the defendant's] funds in property which he and his wife would hold as tenants by the entireties; and thus he would hinder and possibly prevent his creditors from reaching the funds invested by him." The Court disallowed such an action, characterizing it as a form of fraud. *Id*. at 186. In *Dunn*, 323 Mich at 692-694, the Court found that the defendant committed constructive fraud by making payments on entireties property instead of paying toward a judgment owed to a creditor.

The situation in the present case is distinguishable. The Steuers were, quite simply, following applicable tax laws with regard to the joint returns. They were amending returns filed in years prior in order to take advantage of loss-carryback rules. There is no indication or allegation that the filing of joint returns before 2008 was improper. Cross-appellant agrees that the Steuers filed amended returns in obtaining the refunds and that these refunds were issued in connection with pre-lawsuit tax years. As such, the Steuers were *amending* their *pre-insolvency* and *pre-judgment* tax status on the basis of losses incurred, and no party has contended on appeal that the Steuers broke any tax laws. They legally used the carryback provisions of the tax code to amend the joint returns.

26 CFR 6013-1(a)(1) states, in part, "[f]or any taxable year with respect to which a joint return has been filed, separate returns shall not be made by the spouses after the time for filing the return of either has expired." As such, the filing of *joint* amended returns was proper and had to be done within a prescribed timeframe. See 26 USC 6511(d)(2)(A). And the carryback losses were joint losses. See, e.g., 26 CFR 1.172-7(f) (discussing computation of carryback losses for spouses). By taking advantage of loss-carryback provisions and legally amending their pre-insolvency tax status, the Steuers were not committing fraud. The money, in essence, "related back" to pre-lawsuit finances as a result of the legal application of tax laws, and the trial court did not err by excluding the tax refunds from the attachable assets.

## B. HOME-EQUITY LINE OF CREDIT

Next, Shafer argues that the trial court erred by finding that a home-equity line of credit (HELOC) obtained by David and Brenda was not subject to attachment because it constituted

---

[12] Brenda, when filing separately after 2008, had obtained certain carryforwards of money owed from earlier joint returns.

entireties property. Again, we disagree. The issue is one of law and subject to de novo review. *Hill*, 277 Mich App at 507.

In *SNB Bank & Trust v Kensey*, 145 Mich App 765, 776; 378 NW2d 594 (1985), the Court stated, "[i]n Michigan, rents from property held by the entireties are not subject to garnishment to pay the debts of the husband." In *People's State Bank of Pontiac v Reckling*, 252 Mich 383, 383-384; 233 NW 353 (1930), a husband and wife owned a premises by the entirety and leased it. A judgment creditor of the husband sought to garnish rent due on the lease and was granted a writ of garnishment by the lower court. *Id*. at 384. Our Supreme Court ruled that MCL 557.151 necessitated reversal. *Id*. at 384-385.

The present case involved an HELOC as opposed to rents. However, there is no logical reason for treating an HELOC secured by entireties property differently from rents derived from entireties property. In fact, the argument for treating an HELOC as remaining in the character of entireties property is even stronger than corresponding argument for rents, seeing as the owned home is used as security for and put at risk to obtain an HELOC and experiences a decline in equity value as a result. As such, the trial court did not err by finding that the HELOC amount was not attachable by the receiver.[13]

## C. TAX-FORECLOSURE PURCHASES

On four occasions, David purchased property at tax-foreclosure auctions in his own name and then transferred the properties to Franklin Ridge Homes, LLC, a BSST entity. Shafer argues that by doing so, David used his own money to transfer property to Brenda and that the trial court erred by finding that these transfers were not fraudulent. He also argues that the trial court applied an incorrect burden of proof when analyzing the transfers. Because the trial court, not this Court, sits as the arbiter of credibility, we disagree.

Whether the transfers made to Franklin Ridge were fraudulent is a question of fact. As such, the clear-error standard of review is applicable. *Alan Custom Homes, Inc*, 256 Mich App at 512. To the extent that cross-appellant is arguing that the trial court applied an incorrect burden of proof, this argument involves a question of law and the standard of review is de novo. *Hill*, 277 Mich App at 507.

In rejecting Shafer's claim of fraud, the trial court referred to testimony by David that he used funds from SAA or the BSST to purchase the properties and noted that no evidence had been presented to rebut this testimony. The court explicitly stated that it found David's testimony on the topic of the Franklin Ridge transfers to be credible. It stated that David acquired the properties as an agent of SAA and specifically found that "this was not a situation where [David] turned his own money into real property that he then transferred to Franklin Ridge."

---

[13] Given that there is Michigan caselaw available to apply in these non-bankruptcy state proceedings—namely *SNB Bank & Trust* and *People's State Bank of Pontiac*—we decline to rely on bankruptcy caselaw cited by Shafer.

At trial, David testified that he worked on Franklin Ridge projects as an employee of SAA and was involved in acquiring lots Franklin Ridge owned. He admitted that he acquired several lots for Franklin Ridge in his own name and then transferred the lots to the company. Three of the properties in question were acquired in 2010 and one in 2014. David claimed that he used his own name at the tax auctions because he did not know, at the time, how to acquire tax-sale property in the name of an entity. He said that, in general, he was shocked at how inexpensive properties were and that he saw investment opportunities. Significantly, he said that it was Brenda's money, from her inheritances, that funded *all* of Brenda's real estate entities.

The fundamental problem with Shafer's argument is that the trial court was the arbiter of credibility, *Ambs*, 255 Mich App at 652, and the court believed David's testimony: in the course of these transactions, David was acquiring property using Brenda's money for the benefit of Franklin Ridge, and *not* "laundering" his own money. It is not this Court's role to usurp reasonable credibility determinations made by a lower court. *Id*.; see also MCR 2.613(C) ("[R]egard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it.").

Shafer claims that David's testimony about whether he knew how to acquire a tax-sale property in the name of an entity was contradicted by evidence that before one of the transactions at issue—i.e., the 2014 transaction—he had, in fact, acquired properties at tax sales in the name of entities. But the trial court did not place any emphasis on this aspect of the evidence; it was concerned with whether David used his own money to buy the properties, and it explicitly found that he did not. Instead, the trial court determined that David was acting in the service of Franklin Ridge and Brenda—and was not "laundering" his own money.

Shafer also argues that David's testimony about the four transactions cannot be deemed credible because David, for details of the transactions, was relying on Orlando's report, and the court specifically found Orlando to lack credibility. But David, without any reference to Orlando's report, testified that it was Brenda's money, received from her inheritances, that funded *all* of Brenda's real estate entities.

Shafer finally argues that the trial court applied an improper burden of proof because he had made out a prima facie case of a fraudulent conveyance and it was therefore up to the appellants "to show that the transaction [was] in all respects bona fide[.]" See MCL 600.6131(1). In support of his position that the trial court applied an improper burden of proof, Shafer refers to the trial court's statement that "no evidence was admitted to refute" David's testimony that he did not use his own money to purchase properties for Franklin Ridge. However, the trial court's statement does not demonstrate that it applied an improper burden of proof. The court's opinion makes clear that it was concluding, *on the basis of evidence presented by appellants*—specifically David's testimony—that the transactions were bona fide. In other words, the trial court found that appellants had proved the validity of the transactions. Shafer's burden-of-proof argument is without merit.

## D. VEIL-PIERCING

Finally, Shafer argues that the trial court erred by failing to find that corporate veils could be pierced to obtain, for Tarrant, funds held by Brenda's limited-liability companies (LLCs). He

claims that access by the receiver to assets of the LLCs is necessary to effectuate the other rulings of the trial court.

The receiver argued below that all assets of Brenda's LLCs should be subject to liquidation to satisfy the Tarrant judgment because the LLCs were essentially "alter egos" of David made up of fraudulently transferred funds. Thus, that aspect of the present issue is preserved. *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007). However, Shafer did not argue below that the assets of the LLCs should be used to satisfy other aspects of the receivership judgment itself. That aspect of the present issue is not preserved. *Id*. Whether fraud occurred in connection with the LLCs such that attachment of all their assets was warranted is a question of fact subject to clear-error review, see *Alan Custom Homes, Inc*, 256 Mich App at 512, but unpreserved issues are reviewed under the plain-error doctrine, *Kern*, 240 Mich App at 336.

Henderson testified that all the business entities of David and Brenda actually belonged to David and that he had valued them at "between 4 and 5 million" dollars for purposes of the bench trial. This figure was obtained by "project[ing] backwards" the current value of $8.3 million to 2007, 2009, or 2010, years when investments into the companies had been made. The receiver claimed that $5,000,000 was subject to attachment on the basis of an alter-ego theory and David's "amass[ment]" of value in various entities. The court found that this theory had not been properly pleaded by Shafer, thus depriving appellants of an ability to challenge it at trial. The trial court also found that veil-piercing was not appropriate because no fraud or wrong had been committed with regard to the LLCs at issue.

Shafer's complaint did not indicate that he was seeking to liquidate and attach the value of all the LLCs at issue. Cross-appellant contends that such specific pleading was not required because once fraud was proven, obtaining the value of the LLCs was merely a remedy that did not need to be pleaded. This argument is a stretch, however, because after trial, and without having asserted as much in the complaint, Shafer sought to attach up to $5 million in assets on the basis of claimed fraud in connection with the alleged alter-ego companies. This amounted to more than a "remedy" applied to the other legal theories raised.[14]

Reversal is not warranted in any event. Shafer acknowledges that his claim is not traditional because he is not attempting to "reach a shareholder where the corporation is already obligated." But he acknowledges that veil-piercing cases such as *Florence Cement Co v Vettraino*, 292 Mich App 461; 807 NW2d 917 (2011), and *Foodland Distributors v Al-Naimi*, 220 Mich App 453; 559 NW2d 379 (1996), are nevertheless applicable to his claim. In *Florence Cement Co*, 292 Mich App at 469, this Court indicated that a necessary element for concluding that a corporate form has been abused for the purpose of avoiding liability is that the corporate entity "must have been used to commit a wrong or fraud[.]" See also *Foodland Distributors*, 220 Mich App at 457. The trial court in the present case concluded that this necessary element had not been established. It stated, "The [c]ourt sees a very clear distinction between the assets [David] had at the time of [j]udgment in the underlying litigation and any profits earned post [j]udgment by the companies." Significantly, it stated, "Those profits were realized by the companies themselves and by [Brenda]

---

[14] Cross-appellees forcefully objected to the receiver's attempt to add this theory after trial.

as owner of those companies." The trial court stated that the mere fact that David performed work for Brenda's companies did not establish that fraud was taking place such that the companies' value should be deemed attachable by the receiver. We find no error in the trial court's position.

A review of the record does not lead to a definite and firm conviction that the trial court made a mistake with regard to this finding. *Alan Custom Homes, Inc*, 256 Mich App at 512. David testified that it was Brenda's money, from her inheritances, that funded all of Brenda's real estate entities. He claimed that management fees, for the management of Brenda's investments, were paid at market rates. Shafer's own expert witness, Henderson, acknowledged that if Brenda legitimately owned an entity, she could hire someone to manage it and thereby make a profit. He also agreed that Brenda had received significant loans from her father and that nothing on paper showed anyone other than Brenda or her trust owning the LLCs at issue. Brenda testified that she invested in various real estate LLCs and realized profits through David's work. She said that she decided to invest her inheritance money in real estate through David's work because the timing was good for getting into the real estate market. Brenda said that David would look for the investment opportunities and she would decide whether to invest. She said the investments had been good and that she had made a profit. Henderson admitted that David was very talented with regard to his real estate work.

As noted, the trial court sits as the arbiter of credibility, *Ambs*, 255 Mich App at 652, and it believed Brenda's assertion that she used her inheritance money to invest in real estate, that she realized profits as the owner of the companies, and that David did not have any ownership interest in the companies. The trial court also found, "To the extent [Shafer] argue[s] that the various LLCs were funded using co-mingled funds, the [c]ourt has already ruled on those funds (e.g., tax returns and settlement funds) individually." The trial court was implicitly concluding that even though some commingling of funds had occurred—and that funds improperly assigned as Brenda's would be subject to attachment—this was not enough to prove that it was actually David who "owned" the companies at issue.

Shafer goes on to argue that corporate veil-piercing must be allowed in this case in order to effectuate the other findings of fraudulent transfers made by the trial court. But the trial court's ruling makes clear that a significant number of assets are indeed attachable. Disregarding the Sun Healthcare monies and the "extra" $100,000 discussed below, the court found a total of $2,167,626.06, plus the as-yet-to-be-determined value of certain SAA stock, attachable where it had been fraudulently transferred to Brenda or the BSST. Shafer argues that he will be unable to collect on this judgment without a ruling that the corporate veil of the LLCs can be pierced. But satisfaction of the trial court's receivership judgment was not the subject being addressed by the trial court. The proper method for collecting on the receivership judgment has not yet been addressed below and will not be addressed in the first instance by this Court.

IV. CONCEDED ISSUE

We lastly note that the trial court's order mistakenly lists $100,000 in transferred checks as attachable twice by the receiver. Shafer has conceded on appeal that the order must be amended to make clear that the $100,000 is attachable only once, and we so order.

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.  We do not retain jurisdiction.

/s/ Karen M. Fort Hood
/s/ Kathleen Jansen
/s/ Jonathan Tukel